## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| AL BASKIN CO. (d/b/a MARK | ) | Case No. 09-09825 |
| SHALE), an Illinois Corporation | ) | |
| | ) | Honorable Carol A. Doyle |
| FEIN: 36-2154120 | ) | |
| | ) | |
| Debtor. | ) | **Hearing Date and Time:** |
| | ) | **June 30, 2009 at 10:30 a.m.** |

## ORDER CONFIRMING SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR AND AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND RELATED RELIEF

At Chicago, in said District, this 30th day of June, 2009.

**THIS CAUSE** coming on to be heard upon the Motion of AL BASKIN CO., D/B/A

MARK SHALE, an Illinois corporation, debtor and debtor in possession herein (**"Debtor"**)

for entry of orders: (1) *approving the sale process, bidding procedures, bid protection, break-*

*up fee and form of asset purchase agreement for the sale of substantially all of the assets of*

*the estate; (2) scheduling a public auction and authorizing the sale of the assets of the Debtor*

*free and clear of liens, claims, encumbrances and interests; and (3) authorizing the*

*assumption and assignment of executory contracts and unexpired leases,* pursuant to Sections

363 and 365 of the Bankruptcy Code and Rules 2002, 6004 and 6006 of the Federal Rules of

Bankruptcy Procedure (the **"Sale Procedures Motion"**); an order approving the Sale

Procedures Motion having been granted and having established a hearing for approval of the

sale contemplated thereby on June 30, 2009 (the **"Sale Hearing"**); due written notice of the

Sale Procedures Motion and the Sale Hearing having been given to all parties listed on the

Official Service List herein, and all known creditors and other interested parties in this case;

7098 ORD A0234856.WPD 2

no party other than Catellus Operating Limited Partnership having been heard to object to the entry hereof and said objection having been resolved pursuant to agreement of the parties; statements of counsel and other interested parties present at the Sale Hearing, and the Court being otherwise fully advised in the premises;

**NOW, THEREFORE, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT:**

1.      On March 23, 2009 (the **"Petition Date"**), the Debtor filed a voluntary petition under Chapter 11 (the **"Chapter 11 Case"**) of the Bankruptcy Code. After the filing of the Chapter 11 Case, the Debtor continued to manage and operate its property and affairs as a debtor-in-possession under the supervision of this Court pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.      No committee of unsecured creditors has been formed in the Chapter 11 Case.

3.      The Debtor is an Illinois corporation engaged in the retail sale of high-end men's and women's clothing (the **"Business"**). As of the commencement of the Chapter 11 Case, the Debtor operated the Business from eight retail locations in four states, including four stores in the Chicagoland area. Since the Petition Date, the Debtor has ceased operating all four of its out-of-state retail stores and its outlet store in Chicago. In addition to its remaining retail stores, the Debtor also sells its clothing through its website, www.Markshale.com. The Debtor coordinates its sales operations and maintains accounting functions from its principal place of business located at 10441 Beaudin Blvd., Woodridge, Illinois, which also serves as the Debtor's warehouse. Each of the Debtor's eight stores in operation as of the Petition Date and its principal place of business / warehouse are leased from independent third parties.

4.      As more fully described in the Sale Procedures Motion, since the filing of this Case, the Debtor was unable to obtain sufficient sources of working capital from its previous

secured creditor, Bank of America, N.A., to permit an internal plan of reorganization to be filed and confirmed. Without such capital, the Debtor was required to embark upon an orderly liquidation in which it sold its inventory at significantly discounted prices through an aggressive retail marketing program; closed the majority of its stores in phases over the initial two months of the Chapter 11 Case and relocated any remaining inventory from said closed stores into its then-operating stores and/or its warehouse; and concurrently sought to sell the Company as a downsized going concern consisting primarily of its Chicago area stores.

5.    After the Debtor had closed five of its retail locations and a complete liquidation appeared imminent, the Debtor was able to obtain post-petition financing from JOB Investments, LLC, a Delaware limited liability company (the **"DIP Lender"**) pursuant to that certain Interim Order (I) Authorizing Secured Post-petition Financing Pursuant to 11 U.S.C. §364(c); and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c) entered on May 27, 2009 (**"DIP Financing Order"**), the proceeds of which were used to fully satisfy all of the remaining indebtedness owing to Bank of America. One of the conditions of the DIP Financing Order was that the DIP Lender make an offer, or cause an offer to be made, to acquire all or substantially all of the assets of the Debtor on or before June 5, 2009, which it did through an affiliate, MS Mark Shale, LLC ("**Buyer**"), prompting the Debtor to file the Sale Procedures Motion.

6.    Pursuant to the Sale Procedures Motion, the Court entered an Order: (1) Approving the Sale Process, Bidding Procedures, Bid Protection, Break-up Fee and Form of Asset Purchase Agreement for the Sale of Substantially All of the Assets of the Estate; (2) Authorizing the Sale of the Assets of the Debtor Free and Clear of Liens, Claims, Encumbrances and Interests; and (3) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases (the **"Sale Procedures Order"**).

7.      The Sale Procedures Order contemplated the Sale of substantially all of the Debtor's assets (the "**Sale Property**") to the Buyer pursuant that certain Asset Purchase Agreement by and between Buyer and Debtor attached hereto as Exhibit A and made a part hereof (the "**Asset Purchase Agreement**"), subject to competitive bidding at an auction to be conduced by the Debtor's counsel on June 26, 2009 (the "**Auction**").

8.      In order to expedite and maximize its assets sales efforts for the benefit of all of the creditors and other interested parties in this Case, shortly after the Chapter 11 Case was filed, the Debtor (a) prepared confidential information packages using information acquired from the Debtor's management, the Debtor's current and historical financial statements, investigation of the Debtor's operations, and review of the industry in which the Debtor operates; (b) identified potential interested strategic and/or financial buyers through its contacts in the industry; (c) gave interviews to media such as Crain's Chicago Business and the Chicago Tribune indicating that the Debtor was seeking potential purchasers to continue the Debtor's operations; (d) engaged in extensive negotiations with at least one company that sought to be a liquidating agent for the Debtor, so that the Debtor could evaluate going concern offers in context and perform proper comparative analysis; (e) otherwise used the knowledge, experience, and contacts acquired by management throughout the Debtor's 60+ year history to save the Business; and (f) listed an advertisement in the Chicago Tribune Auction Mart published on Sunday, June 21, 2009 detailing the particulars of the Sale.[1]

9.      Notice of the Sale Procedures Motion, the Auction, and the Sale Hearing was provided by the Debtor in the form of: (a) a *Summary Notice of Requested Hearing and Bidding Procedures*, served by the Debtor's counsel upon the Office of the U.S. Trustee, all counsel of record, all known lien holders, all other known creditors in this case and all known

---

[1]An identical advertisement was scheduled to be placed on Wednesday, June 24, 2009, but a mechanical error suffered by the Chicago Tribune precluded that advertisement from being run.

7098 ORD A0234856.WPD 2                                 4

prospective purchasers on June 9, 2009, as reflected in a Certificate of Service filed by

Debtor's counsel on June 10, 2009; and (b) a *Notice of Sale and Approved Bidding*

*Procedures*, served upon the Office of the U.S. Trustee, all counsel of record, all known lien

holders, the Debtor's twenty largest creditors in the Chapter 11 Case and all known

prospective purchasers on June 17, 2009, as reflected in a Certificate of Service filed by

Debtor's counsel on June 18, 2009 (collectively, the **"Notice"**).

        10.    Notwithstanding the Debtor's efforts, the Debtor did not receive any other

offers to acquire the Sale Property.

        11.    On June 26, 2009, pursuant to the terms and conditions of the Sale Procedures

Order, the Debtor conducted the Auction, at which no parties other than the Buyer appeared

or participated.

        12.    Accordingly, the highest and best offer to purchase the Sale Property was

submitted by Buyer, by means of the assumption of various secured and unsecured

obligations of the Debtor in the approximate amount of $3.5 million (collectively, the

**"Purchase Price"**), pursuant to the Asset Purchase Agreement.

        13.    The Asset Purchase Agreement  provides that the Sale Property is being

purchased "AS IS, WHERE IS" with no express or implied representations, statements,

conditions or warranties of any kind or nature whatsoever excluding only title thereto free and

clear of all liens and security interests except those set forth in the Asset Purchase Agreement,

and those other representations and warranties set forth in the Asset Purchase Agreement.

        14.    There are no financing, due diligence or other contingencies to the closing of

the Asset Purchase Agreement except for the entry by Buyer of either an amendment to the

Assigned Leases (as defined in the Asset Purchase Agreement) or new leases with respect to

the Store or Warehouse Facility (as such terms are defined in the Asset Purchase Agreement)

                  

upon terms and conditions satisfactory to Buyer and such other conditions expressly set forth in the Asset Purchase Agreement.

15.     Buyer has completed and/or waived all of its due diligence efforts regarding the Debtor's Business and the Sale Property as of the entry hereof.

16.     Buyer has required the Debtor to assume and assign to Buyer at Closing those certain executory contracts and unexpired leases listed on Exhibit B hereto (collectively, the **"Executory Contracts"**), all of which were included in an Assumption Notice (as defined in the Sale Procedures Motion), and has further agreed to cause all cure amounts reflected herein (collectively, the **"Cure Costs"**) to be paid at Closing or as soon thereafter as is practicable as set forth in the Asset Purchase Agreement.

17.     Based upon the de minimis amount of the Cure Costs, the Debtor believes that the Buyer has the financial ability to consummate the transactions contemplated in the Asset Purchase Agreement and provide such adequate assurance of future performance under each of the Executory Contracts as is necessary for the Debtor to assume same at the Closing in accordance with Section 356(b)(1) of the Bankruptcy Code.

18.     No sales or brokerage commissions have been incurred or will become due upon the Closing of the Asset Purchase Agreement.

19.     No parties other than Catellus Operating Limited Partnership were heard to object at the Sale Hearing to the sale of the Sale Property pursuant to the Sale Procedures Order or the Debtor's acceptance of the Asset Purchase Agreement, and assumption and assignment of the Executory Contracts.

20.     Under the terms of the Sale Agreement and as announced in open court, Buyer has agreed to the terms and conditions of the sale as set forth in the Asset Purchase Agreement and has agreed to make the necessary payments and deliveries required at the closing thereof, which is scheduled to occur on or before July 15, 2009 (**"Closing"**).

21.     Based upon the offer of proof by Debtor's counsel, the supporting testimony of Scott Baskin, co-president of the Debtor, and the lack of any challenge to Buyer's good faith, Buyer is a good faith purchaser for the Sale Property, and the Purchase Price approved herein was not controlled by any agreement among the potential or actual bidders for the Sale Property.

22.     The representatives of the Debtor and Buyer have made all necessary disclosures of the material terms and conditions of all anticipated employment agreements between Buyer and the Debtor's current management. Such prospective employment arrangements have enhanced the Buyer's willingness to enter into the Asset Purchase Agreement and served to increase the Purchase Price.

23.     Based upon the record in this case as well as the testimony adduced in open court and statements of other parties present, Buyer is a good faith, bona fide purchaser for the Sale Property.

24.     The Debtor and Buyer have each acted in good faith and have made all appropriate disclosures.  For the reasons stated in open court and herein, the Debtor's execution and performance of the Asset Purchase Agreement is in the best interests of this estate and its creditors, and complies with the sales procedures authorized by the Sale Procedures Order.

**NOW, THEREFORE, THE COURT MAKES THE FOLLOWING CONCLUSIONS OF LAW:**

A.     This Court has jurisdiction over the subject matter of this Order pursuant to 28 U.S.C. §1344.

B.     The entry of this Order and all proceedings relating thereto collectively constitute a "core proceeding" pursuant to, without limitation, 28 U.S.C. § 157(b)(2)(N) and (O).

C.      The Notice and mailings by the Debtor's counsel, and the Debtor's other marketing efforts for the Sale Property, constitute a commercially reasonable sales effort and satisfy the requirements of Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure.

D.      Acceptance of the Asset Purchase Agreement is in the best interests of this estate and there is an immediate need for the sale of the Sale Property to avoid irreparable diminution of the assets in this estate.

E.      The sale of the Sale Property pursuant to the Asset Purchase Agreement shall be free and clear of any and all liens, claims, interests, liabilities and encumbrances to the fullest extent permitted by Section 363(b) of the Bankruptcy Code, with all valid liens, claims, and encumbrances to attach to the proceeds of sale pursuant to Section 363(f) of the Bankruptcy Code.

F.      The Debtor shall be entitled to assume all of the Executory Contracts identified herein in accordance with the terms of Section 365(b)(1) of the Bankruptcy Code, and assign all of the Debtor's right, title and interest in and to the Executory Contracts to Buyer at the Closing free and clear of any and all liens, claims, interests, liabilities and encumbrances to the fullest extent permitted by Section 363(b) of the Bankruptcy Code, subject to Buyer paying the Cure Costs at Closing or as soon thereafter as is practicable.

G.      Buyer is entitled to the protections of Section 363(m) of the Bankruptcy Code.

H.      The purchase price for the Sale Property set forth in the Asset Purchase Agreement was not controlled by any agreement among the potential or actual bidders for the Sale Property.

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1.      The above described findings of fact and conclusions of law be and are hereby incorporated herein as if fully set forth.

7098 ORD A0234856.WPD 2                           8

2.     The Debtor be and is hereby ordered and directed forthwith to accept and execute the Asset Purchase Agreement for the purchase of the Sale Property pursuant to the terms and conditions thereof and as announced in open court at the Sale Hearing, which Asset Purchase Agreement shall be substantially in the form attached as Exhibit A hereto, and the Asset Purchase Agreement is hereby approved.

3.     The Debtor be and is hereby authorized and directed to execute such documents or instruments to transfer title of the Sale Property to Buyer and such other documents as may be necessary to effectuate the terms and conditions of this Order and the Asset Purchase Agreement.

4.     Buyer shall have the benefits and protections of Section 363(m) of the Bankruptcy Code.

5.     The adequacy and sufficiency of the form and amount of the Notice and the persons receiving the Notice is hereby approved and ratified.

6.     Upon Closing, the sale of the Sale Property pursuant to the Asset Purchase Agreement shall be transferred to Buyer free and clear of any and all liens, claims, interests, liabilities and encumbrances, with all valid liens, claims, and encumbrances to attach to the proceeds of sale in the same rank and priority as those liens and interests enjoyed prior to the Sale.

7.     The Debtor be and it hereby is authorized and directed to assume and assign to Buyer at the Closing the Executory Contracts, provided that Buyer pays each of the non-debtor parties to the Executory Contracts the Cure Costs associated therewith, if any, at Closing or as soon thereafter as is practicable. The Debtor's counsel be and is hereby directed to send a copy of this Order to all non-debtor parties to the Executory Contracts at the addresses shown in the Assumption Notice within three (3) business days from the entry hereof.

8.      From and after the Closing, with the exception of the obligations to be expressly assumed pursuant to this Order and the Asset Purchase Agreement, Buyer is not assuming, and shall have no liability whatsoever for, any existing or future claims against or liabilities of the Debtor to any person whomsoever, including, without limitation, all creditors or persons holding a claim(s) against the Debtor or interests in the Debtor. All persons and entities holding any claims against the Debtor are, to the fullest extent permitted by applicable law, forever barred from asserting any such existing or future claims or liabilities against Buyer.

9.      The terms and provisions of the Asset Purchase Agreement, together with the terms and provisions of this Order, shall be binding in all respects on the Debtor, the Buyer, the Debtor's estate, all creditors and employees of the Debtor, any trustee appointed in this Case or in any subsequent case involving the Debtor under Chapter 7 or 11 of the Bankruptcy Code, and all other persons having any claim or interest or asserting a claim against or an interest in any of the Sale Property or the Executory Contracts.

10.     This Court retains jurisdiction to construe and enforce this Order and determine and adjudicate any and all issues arising in connection with the Asset Purchase Agreement.

11.     The terms of this Order are nonseverable and mutually dependent.

12.     After consummation of the Asset Purchase Agreement, and at Buyer's expense, Buyer is authorized to object to and prosecute any 503(b)(9) Claim Amount (as defined in the Asset Purchase Agreement); including, but not limited to, raising, as a defense to such claims, the receipt by any claimant of any avoidable transfer.

13.     This Order is a final non-interlocutory order, and pursuant to Rule 6004(g) of

the Federal Rules of Bankruptcy Procedure, the 10 day stay of this Order be and is hereby

waived in its entirety.

_____
U.S. BANKRUPTCY JUDGE

JUL -2 2009

*This Order Prepared by*:
CHAD H. GETTLEMAN, ESQ. (ARDC #944858)
ADAM P. SILVERMAN, ESQ. (ARDC #6256676)
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Boulevard Suite 1050
Chicago, Illinois 60604
312/435-1050
312/435-1059 fax
Counsel to Debtor

# EXHIBIT A

## TO SALE ORDER

## "ASSET PURCHASE AGREEMENT"

## ASSET PURCHASE AGREEMENT

### BY AND BETWEEN

### MS MARK SHALE, LLC.
**as purchaser**

### AND

### AL BASKIN CO. (d/b/a MARK SHALE),
**as seller**

### JUNE 10, 2009

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT dated as of June 10, 2009 (this "Agreement") is entered into by and between MS MARK SHALE, LLC, a Delaware limited liability company, or its assigns (referred to herein as "Purchaser"), and AL Baskin Co. (d/b/a Mark Shale), an Illinois corporation and debtor-in-possession ("Seller"). Purchaser and Seller are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

### RECITALS:

WHEREAS, Seller is engaged in the business of selling high-end men's and women's clothing at retail; a portion of such business is conducted at retail stores, a portion is conducted via catalogue sales and a portion is conducted through its website, www.Markshale.com, (collectively, the "Business");

WHEREAS, Seller desires to sell, transfer, convey, assign and deliver the Acquired Assets (as defined below) and to assign the Assumed Obligations (as defined below), and Purchaser, either individually and/or collectively, desires to purchase, take delivery of, and assume such Acquired Assets and Assumed Obligations, upon the terms and subject to the conditions set forth herein;

WHEREAS, Seller has filed and commenced a Chapter 11 bankruptcy case (the "Bankruptcy Case") that is pending in the United States Bankruptcy Court for the Northern District of Illinois, (the "Bankruptcy Court"); and

WHEREAS, the transactions contemplated by this Agreement (the "Transactions") will be consummated pursuant to a Sale Order (as defined below) to be entered in the Bankruptcy Case under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code (as defined below), and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties, and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1.   **Definitions**.

1.1    Definitions. The following terms, as used herein, have the following meanings:

"503(b)(9) Claim Amount" shall have the meaning ascribed to such term in Section 2.6(a) hereof.

"Acquired Assets" shall have the meaning ascribed to such term in Section 2.1 hereof.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person.

"Agreement" shall have the meaning ascribed to such term in the Preamble hereof.

"Approval Hearing" shall mean the hearing conducted by the Bankruptcy Court to approve the highest and best bid for the Acquired Assets following the Auction.

"Assigned Contracts" shall have the meaning ascribed to that term in Section 2.1(a) hereof.

"Assigned Lease" shall have the meaning ascribed to that term in Section 2.1(b) hereof.

"Assignment and Assumption Agreement" shall have the meaning ascribed to such term in Section 2.10(a) of this Agreement.

"Assumed Obligations" shall have the meaning ascribed to that term in Section 2.3 hereof.

"Auction" shall have the meaning ascribed to that term in Section 3.1(b) hereof.

"Avoidance Actions" means all avoidance claims or other causes of action, whether arising under the Bankruptcy Code or otherwise, and the proceeds thereof, which are available to Seller under Section 510 or under any of Sections 542 through 553 of the Bankruptcy Code, of whatever kind or nature, and whether asserted or unasserted.

"Back-Up Bid" shall have the meaning ascribed to that term in Section 3.1(b)(vii) hereof.

"Bankruptcy Case" shall have the meaning ascribed to such term in the third WHEREAS clause of this Agreement.

"Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended.

"Bankruptcy Court" shall have the meaning ascribed to such term in the third WHEREAS clause of this Agreement.

"Books and Records" shall have the meaning ascribed to such term in Section 2.1(g) hereof.

"Budget" shall have the meaning ascribed to such term in the Financing Order.

"Business" shall have the meaning ascribed to such term in the first WHEREAS clause of this Agreement.

"Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in Chicago, Illinois are authorized or required by law to close.

2

"Carve Out" shall have the meaning ascribed to such term in the Financing Order.

"Cash On Hand" means deposits in transit, credit card receivables or cash in the cash registers at the Stores or otherwise held at the Stores or the Warehouse Facility.

"Claim" means a "claim" as defined in Section 101 of the Bankruptcy Code.

"Closing" shall have the meaning ascribed to such term in Section 2.8 of this Agreement.

"Closing Date" means the date of the Closing.

"Code" means the Internal Revenue Code of 1986, as amended.

"Cost Value" shall have the meaning ascribed to such term in Section 2.7(c) hereof.

"Cure Costs" means the amount set forth in Schedule 2.1(a) and Schedule 2.1(b) as the amount that must be paid to cure all prior defaults under an Assigned Contract or Assigned Lease.

"Defective Merchandise" means such items of inventory that are worn, scratched, broken, faded, torn, mismatched, tailored or effected by similar defects rendering it not first quality.

"DIP Indebtedness" shall have the meaning ascribed to such term in Section 2.6(a).

"DIP Loan Documents" shall have the meaning ascribed to such term in the Financing Order.

"Employee Manuals" shall have the meaning ascribed to such term in Section 2.1(i) of this Agreement.

"End Date" shall have the meaning ascribed to such term in Section 12.1(b) of this Agreement.

"Environmental Laws" shall have the meaning ascribed to such term in Section 4.12(e)(i) of this Agreement.

"Excluded Assets" shall have the meaning ascribed to such term in Section 2.2 hereof.

"Excluded Liabilities" shall have the meaning ascribed to such term in Section 2.4 of this Agreement.

"Executory Contract Option Period" shall have the meaning ascribed to such term in Section 3.2 hereof.

"Executory Contracts" shall have the meaning ascribed to such term in Section 2.1(a) hereof.

"Financing Order" means that certain Interim Order (I) Authorizing Secured Postpetition Financing on a Superpriority Basis Pursuant to 11 U.S.C. Section 364 And (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c) dated May 27, 2009 and entered on the docket of the Bankruptcy Case on May 28, 2009.

"FF&E" means fixtures, furnishings and equipment owned by Seller and utilized in the Business.

"Inventory Completion Date" shall have the meaning ascribed to such term in Section 2.7(a) hereof.

"Inventory Dispute Period" shall have the meaning ascribed to such term in Section 2.7(b) of this Agreement.

"Inventory Taking" shall have the meaning ascribed to such term in Section 2.7(a) hereof.

"Intellectual Property Right" means, to the extent that Seller is permitted by law to transfer such assets to Purchaser without obtaining any third-party consents, all rights in and to any trademark, service mark, trade name, brand name, slogan, license, invention (whether or not patented or patentable), patent (licensed, owned or applied for), trade secret, copyright (licensed or owned), know-how patent application (including any registrations or applications for registration of any of the foregoing), and any other intellectual property in any and all jurisdictions worldwide utilized by Seller in its Business and any derivatives thereof, all systems manuals and documentation, all systems software and any applicable upgrades, all systems licenses and other proprietary rights and general intangibles relating to the operation of the Business, including any internet domain names and addresses and any "800" or toll free number or any other similar type of proprietary intellectual property right which is related to the Business.

"Lien" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest or other encumbrance in respect of such property or asset.

"Material Adverse Effect" means a material adverse effect on the Business and the Acquired Assets, taken as a whole as may be determined in Purchaser's reasonable discretion.

"Merchandise" means all goods and inventory that is owned by Seller wherever.

"Open Purchase Orders" means Seller's purchase orders issued in the ordinary course of business relating to all items of men's and women's clothing, accessories and other items held for sale relating to the Business that are open and outstanding on the Closing Date.

"Party" and "Parties" shall have the meaning ascribed to such term in the Preamble of this Agreement.

"Permitted Liens" shall have the meaning ascribed to such term in Section 4.8(c)(i) hereof.

4

"Petition Date" means March 23, 2009.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a governmental unit or political subdivision thereof.

"Potential Bidder" shall have the meaning ascribed to that term in Section 3.1(b)(ii) hereof.

"Purchase Price" shall have the meaning ascribed to such term in Section 2.6 hereof.

"Purchaser" shall have the meaning ascribed to such term in the Preamble hereto.

"Qualified Bid" shall have the meaning ascribed to that term in Section 3.1(b)(ii) hereof.

"Qualified Bidder" shall have the meaning ascribed to that term in Section 3.1(b)(ii) hereof.

"Real Property Leases" means the non-residential real property leases of Seller described on Exhibit D hereof.

"Sale Hearing" shall have the meaning ascribed to that term in Section 3.1(a) hereof.

"Sale Motion" shall have the meaning ascribed to that term in Section 3.1(a) hereof.

"Sale Proceeds" shall have the meaning ascribed to that term in Section 3.1(a)(i) hereof.

"Sale Order" shall have the meaning ascribed to that term in Section 8.3 hereof.

"Security Deposit" means any security deposit paid by Seller with respect to the Acquired Assets.

"Seller" shall have the meaning ascribed to such term in the Preamble hereto.

"SKU" means the unique stock keeping unit identifier assigned to identical pieces of Merchandise.

"Stores" means those retail store locations operated by Seller and described on Exhibit B attached hereto.

"Tax" means (i) any tax, governmental fee or other like assessment or charge of any kind whatsoever (including withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any governmental authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign), or (ii) liability for the payment of any amounts of the type described in (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person.

"Transactions" shall have the meaning ascribed to such term in the fourth WHEREAS clause of this Agreement.

"Transferred Employees" means those current employees of Seller who are employed by Purchaser on or after the Closing Date.

"Transition Services Agreement" means that certain Transition Services Agreement to be executed by Seller and Purchaser, upon mutually agreeable terms, at or prior to the Closing.

"Warehouse Facility" shall mean the leased office and warehouse premises leased by Seller located at 10441 Beaudin Blvd., Suite 100, Woodridge, Illinois.

"WARN Act" shall have the meaning ascribed to such term in Section 2.4 of this Agreement.

"Winning Bid" shall have the meaning ascribed to that term in Section 3.1(b)(iii) hereof.

"Winning Bidder" shall have the meaning ascribed to that term in Section 3.1(b)(iii) hereof.

## 2.   Purchase and Sale

2.1    Purchase and Sale.   Subject to the terms and conditions set forth in this Agreement, at the Closing, Seller agrees to sell, transfer and deliver to Purchaser, and Purchaser agrees to purchase, acquire and accept from Seller, on an "as is, where is" basis except as expressly set forth in Section 4 hereof and without any representation or warranty on the part of Seller as to fitness, merchantability or otherwise, all right, title and interest of Seller as of the Closing Date in and to all assets, properties and rights, to the extent owned, held or primarily used in the conduct of the Business, free and clear of all Liens and Claims (other than Permitted Liens and the Assumed Obligations) to the maximum extent permitted by Section 363 of the Bankruptcy Code, including, but not limited to (collectively, the "Acquired Assets"):

(a)    the contracts, leases (other than real property leases), warranties, commitments, arrangements, credit agreements, credit guarantees, purchase and sale orders, and agreements relating to Intellectual Property Rights, whether oral or written, identified on Schedule 2.1(a) which are related to the Business (collectively, the "Executory Contracts"), solely to the extent that such Executory Contracts are designated by Purchaser either on or prior to the date of the Closing or such other date prior to the end of the Executory Contract Option Period, to be assumed and assigned to Purchaser and to the extent such Executory Contracts are assignable under bankruptcy law or applicable non-bankruptcy law without the consent of the counterparty(ies) thereto (to the extent so designated, collectively, the "Assigned Contracts"), together with the right to receive income in respect of such Assigned Contracts on and after the Closing Date, and any causes of action  relating to past or current breaches of the Assigned Contracts;

6

(b)  all of Seller's rights in and to those certain Real Property Leases identified in Schedule 2.1(b) (the "Assigned Leases"), together with all permanent fixtures, improvements and appurtenances thereto and associated therewith;

(c)  all Merchandise;

(d)  all Open Purchase Orders provided herein, that any such Open Purchase Orders must (i) be of the kind, quality and mix as is consistent with Seller's ordinary course of business and past practices; (ii) to be delivered to Seller's Warehouse Facility; and (iii) be identified on a schedule to be submitted at closing or any time thereafter; and provided further, however, Purchaser's obligation to accept conforming Open Purchase Orders shall be limited in an amount and at a price acceptable to Purchaser.

(e)  all transferable Intellectual Property Rights related to the Business, including the items listed on Schedule 2.1(e), and any causes of action relating to past or current infringement of the Intellectual Property Rights.

(f)  all owned FF&E, machinery, equipment, personal property, office equipment, furnishings, computer hardware and spare parts relating thereto (including without limitation calculators, paper, office forms, file cabinets, chairs, desks, warehouse order pickers, tuggers, storage containers, floor cleaners, scanners, security equipment, warehouse racking, store equipment, registers, phones, safes, communication lines, delivery trucks, tractor trailers, automobiles, tractors, fork lifts, material handling equipment) wherever located, including but not limited to the items listed on Schedule 2.1(f).

(g)  all books, records and other documents (whether on paper, computer diskette, tape or other storage media) of Seller relating to the Business or the Acquired Assets, including property records, purchase and sale records, credit data, marketing, advertising and promotional materials, personnel and payroll records of Transferred Employees (to the extent permitted by applicable law), accounting and financial records, fixed asset lists, customer lists, customer records and information (including internet mailing addresses names and addresses of credit card customers), inventory history, historical financing information (including reserve calculations), fixed asset information, mailing and supplier lists, parts lists, correspondence, studies, sales history, files and similar items, other than incorporation documents and corporate minute books (collectively, the "Books and Records"); provided, however, Purchaser shall be entitled to exclude any Books and Records from Acquired Assets by giving written notice of the same to the Seller;

(h)  all advertising commercials, videos, photography, and advertising equipment used internally, together with all internal and external signage located in or used in connection with the Business;

(i)  all manuals, training materials, and other documentation relating to employee benefits, treatment and conduct, videos, DVDs, CDs or training

software related to the Business (collectively, the "Employee Manuals"); provided, however, that Seller shall not provide Purchaser with employee personnel files or information therefrom for employees other than Transferred Employees without the express written permission of said employees;

(j)    all causes of action, including those relating to the Acquired Assets arising on or prior to the Closing Date, other than the Excluded Assets;

(k)    all cash, cash equivalents, prepaid assets and deposits, including, but not limited to Cash on Hand, bank accounts, certificates of deposit, security deposits, deposits with creditors and other deposits of any kind or nature whatsoever;

(l)    all rights and benefits associated with any "key man" or other life insurance policies, any Prepaid Insurance, cash, and Cash on Hand; and

(m)    Avoidance Actions that may be asserted against the holder of any Assumed Obligation; including, but not limited to any landlords of the Assigned Leases.

2.2    Excluded Assets.  Notwithstanding any other provision of this Agreement to the contrary, the Acquired Assets shall not include the following (the "Excluded Assets"):

(a)    all Avoidance Actions other than Avoidance Actions that may be asserted against the holder of any Assumed Obligation; including, but not limited to any landlords of the Assigned Leases;

(b)    the minute books and organizational documents of Seller;

(c)    all rights of Seller arising under this Agreement;

(d)    any Acquired Asset sold or otherwise disposed of pursuant to Section 6.1 prior to the Closing Date;

(e)    any Tax refund, Tax rebate or Tax reimbursement due to Seller or its Affiliates and relating to the Business or any U.S. tax net operating loss of Seller;

(f)    all books and records related to Excluded Assets or any Books and Records which Purchaser elects not to acquire hereof; and

(g)    any Real Property Lease or Executory Contract not identified as an Assigned Contract or Assigned Lease.

2.3 Assumed Obligations. Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge, promptly when payment or performance is due or required, the following liabilities and obligations of Seller or the Business (the "Assumed Obligations").

(a) all Cure Costs for the Assigned Leases and the Assigned Contracts;

(b) Accrued vacation, sick pay and usual and customary benefit days for the Transferred Employees;

(c) all liabilities and obligations of Seller related to or arising under the Assigned Contracts, Assigned Leases and Intellectual Property Rights first arising from and after the Closing;

(d) all amounts due as a result of the rejection of the Real Property Leases (pre-petition and post-petition) by Seller under the Assigned Leases and/or Real Property Leases, which such amounts are estimated to have a potential face value of approx. $3.81 million;

(e) all obligations to accept returns of consumer Merchandise purchased from the Stores or the Seller's website, subject to customary return policies of Seller in effect prior to the Closing; and

(f) all gift cards and other customer credits purchased from or arising from sales or Merchandise to consumers made at the Stores and/or the website.

2.4. Excluded Liabilities. Notwithstanding any other provision of this Agreement to the contrary, Purchaser is assuming only the Assumed Obligations and is not assuming any other liability or obligation of Seller of whatever nature, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise, including severance, termination pay, accrued vacation, pension, profit sharing or any other employee benefit plans, compensation or retiree medical or other benefits and obligations, or any obligation, claim or amount for employees, or any obligation, claim or amount under the Workers Adjustment and Retraining Notification Act ("WARN Act") or COBRA liabilities or liabilities arising under Environmental Laws. All such other liabilities and obligations shall be retained by and remain obligations and liabilities of Seller (all such liabilities and obligations not being assumed being herein referred to as the "Excluded Liabilities").

2.5. Assignment of Contracts and Rights. To the maximum extent permitted by the Bankruptcy Code, the Assigned Contracts, the Assigned Leases, the Purchaser Assigned Real Property Leases and Intellectual Property Rights shall be assumed by Seller and assigned to Purchaser or one or more of its designees pursuant to Section 365 of the Bankruptcy Code. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Acquired Asset or any right thereunder if an attempted

assignment, without the consent of a third party, or an Order of the Bankruptcy Court would constitute a breach or in any way adversely affect the rights of Purchaser or Seller thereunder.

2.6. Purchase Price; Allocation of Purchase Price.

(a) In consideration for the sale, transfer and delivery of the Acquired Assets, and in addition to assuming the Assumed Obligations, Purchaser shall pay to Seller the sum of (i) all outstanding loans and other indebtedness incurred as of the Closing Date by Seller to Purchaser pursuant to the Financing Order and the DIP Loan Documents (collectively the "DIP Indebtedness"); (ii) all unpaid expenses actually incurred prior to the Closing Date, set forth in the Budget and not previously funded by Purchaser; (iii) up to $225,000 of ultimately allowed claims under Section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claim Amount"); and (iv) the Carve Out.

(b) Notwithstanding the foregoing, the 503(b)(9) Claim Amount shall be reduced by any amount recovered (in settlement or otherwise) from such claimants in connection with an avoidable transfer up to the amount of such claimants claim under Section 503(b)(9) of the Bankruptcy Code.

The aggregate of Sections 2.6(a) and (b) hereinafter being referred to as the "Purchase Price."

(c) Purchaser and Seller agree that the Purchase Price, applicable Assumed Obligations and other relevant items shall be allocated in accordance with Section 1060 of the Code and the regulations thereunder and Schedule 2.6(c) hereof (such schedule to be determined jointly by Purchaser and Seller prior to Closing). Purchaser and Seller each agrees to provide the other promptly with any other information required to complete Schedule 2.6(c). Such allocation shall be binding on Purchaser and Seller for all purposes, including the reporting of gain or loss and determination of basis for income tax purposes, and each of the Parties hereto agrees that it will file a statement (on IRS Form 8594 or other applicable form) setting forth such allocation with its federal and applicable state income tax returns and will also file such further information or take such further actions as may be necessary to comply with the Treasury Regulations that have been promulgated pursuant to Section 1060 of the Code and similar applicable state laws and regulations.

2.7. Physical Inventory.

(a) Commencing June 8, 2009, Seller and Purchaser shall cause to be taken a physical inventory of the Merchandise (the "Inventory Taking"), which Inventory Taking shall be completed no later than five (5) days prior to the Auction (the "Inventory Completion Date"). The Inventory Taking shall be conducted in accordance with the procedures and instructions to be mutually agreed by Seller and Purchaser. Seller shall be responsible for of the fees and expenses of the Inventory Taking. Seller and Purchaser shall each have the right to have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking.

10

(b)     Each of Seller and Purchaser shall have a period of three (3) days to review and raise any objections with respect to reconciliation of the Inventory Taking following the delivery thereof (the "Inventory Dispute Period"), during which time each Party may dispute any amounts reflected in the Inventory Taking by giving notice in writing to the other Party specifying each of the disputed items and setting forth in reasonable detail the basis for such dispute. Failure by Seller or Purchaser to dispute amounts or items reflected in the Inventory Taking before the expiration of the Inventory Dispute Period shall be deemed an acquiescence thereto by such Party. The final audited report of the aggregate Cost Value of the Merchandise by the Inventory Taking, after verification and reconciliation thereof by Seller and Purchaser, is referred to as the "Final Inventory Report."

(c)     For purposes of this Agreement, "Cost Value" shall mean with respect to each item of Merchandise, the actual delivered cost for such item of Merchandise. Any and all defective merchandise shall be excluded from the calculations of the Cost Value of the Merchandise.

(d)     With respect to each Store, during the period between the Inventory Completion Date and the Closing Date, Seller shall keep a strict count of register receipts and reports to determine the actual Cost Value of the Merchandise sold. All such records and reports shall be made available to Seller and Purchaser during regular business hours upon reasonable notice. Any Merchandise sold during this period shall be included in Merchandise using the actual Cost Value of the Merchandise sold. If the Cost Value of the Merchandise (other than any Defective Merchandise) on the Closing Date is less than Two Million Eight Hundred Thousand Dollars ($2,800,000.00) then Purchaser shall have the option, upon written notice to Seller, to terminate this Agreement.

2.8.   Closing.     The closing (the "Closing") of the purchase and sale of the Acquired Assets and the assumption of the Assumed Obligations shall take place at the offices of Shaw Gussis Fishman Glantz Wolfson & Towbin LLC., 331 North Clark Street, Suite 800, Chicago, IL, no later than three (3) Business Days after satisfaction of the conditions set forth in Section 10 (other than those requiring a delivery, or the taking of other action, at the Closing), or at such other time or place as Purchaser and Seller may agree.

2.9.   Deliveries by Seller .  At the Closing, Seller will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

(a)     a Bill of Sale, Assignment and Assumption Agreement in a form to be agreed upon between Purchaser and Seller (the "Assignment and Assumption Agreement"), duly executed by Seller, pursuant to which Seller shall transfer and convey the Acquired Assets to Purchaser;

(b)     the Transition Services Agreement, duly executed by Seller;

(c)     an executed agreed upon closing statement setting forth the amounts (as of the Closing Date) of (i) all outstanding loans and other indebtedness incurred as of the Closing Date by Seller to Purchaser pursuant to the Financing Order and the DIP Loan

Documents; (ii) all unpaid expenses incurred prior to the Closing Date, set forth in the Budget and not previously funded by Purchaser; (iii) an estimate of the 503(b)(9) Claim Amount; and (iv) the Carve Out.

(d)    all other documents, instruments and writings reasonably requested by Purchaser to be delivered by Seller to Purchaser at or prior to the Closing in connection with the conveyance of the Acquired Assets and the assumption of the Assumed Obligations pursuant to this Agreement;

(e)    a copy of the Sale Order; and

(f)    funds comprising the Carve-Out, which shall be held in a client fund account and shall only be disbursed upon Order of Court.

2.10.    Deliveries by Purchaser. At the Closing, Purchaser will deliver or cause to be delivered to Seller (unless previously delivered) the following Deliveries by Purchaser:

(a)    a payoff letter with respect to the DIP Indebtedness; and all other amounts payable to Seller on the Closing Date pursuant to Section 2.6(a).

(b)    the Assignment and Assumption Agreement and the Transition Services Agreement, each duly executed by Purchaser;

(c)    an executed agreed upon closing statement setting forth the amounts (as of the Closing Date) of (i) the DIP Indebtedness; (ii) all unpaid expenses actually incurred prior to the Closing Date, set forth in the Budget and not previously funded by Purchaser; (iii) the 503(b)(9) Claim Amount; and (iv) the Carve Out; and

(d)    all other documents, instruments and writings reasonably requested by Seller to be delivered by Purchaser at or prior to the Closing in connection with the consummation of the Transactions pursuant to this Agreement.

3.    Bankruptcy Sale Procedures.

3.1    The Sale Motion. (a) Not later than June 10, 2009, Seller shall file with the Bankruptcy Court a motion for a hearing (the "Sale Hearing") to approve (i) the sale of the Acquired Assets and the assumption and assignment of the Assigned Contracts and Assigned Leases pursuant to Sections 363 and 365 of the Bankruptcy Code (the "Sale Motion"). The Sale Motion shall request that the Bankruptcy Court enter an order approving the Transactions in accordance with the terms of this Agreement. Notice of the Sale Motion shall be promptly served upon all creditors and other interested parties in the Bankruptcy Case as required by the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bankruptcy Court's local rules and served upon such other entities as may be required by the Bankruptcy Court. The Sale Motion shall request that the Court enter an Order which contains, in addition to the requirements set forth in Section 8.3 below, each of the following terms and conditions:

12

(i)    That the sale of the Acquired Assets hereunder (the "Sale") shall be free and clear of all liens and interests other than the Permitted Liens (unless otherwise agreed to by Purchaser in writing), with such liens and interests attaching to the proceeds of the Sale (the "Sale Proceeds") in the same rank and priority as those liens and interests enjoyed prior to the Sale. The Sale Order shall expressly so provide.

(ii)    That the Seller shall be solely responsible for any sales, transfer or other taxes, if any, applicable to the Sale.

(iii)    That the sale of the Acquired Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Seller, except as provided in this Agreement.

(iv)    That Purchaser is assuming only the Assumed Obligations and is not assuming and shall have no liability for any other liability or obligation of Seller of whatever nature, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise.

(b)    In the event of any competitive bidding for the Acquired Assets, an auction (the "Auction") shall be conducted, after which the Court, shall enter an order authorizing the Sale of the Acquired Assets.

(i)    At the Auction, the Seller shall conduct the Auction by open bidding. Provided, however, nothing shall prohibit the Seller, at the Auction, from conducting separate or joint discussions with the Purchaser or any secured lenders in private and not on the record of such proceeding.

(ii)    Unless otherwise ordered by the Court for cause shown, for any Person, other than Purchaser, to participate in the Auction (a "Potential Bidder"), such Person must deliver to the Seller (x) such information as the Seller shall request establishing a Potential Bidder's ability to close the Sale of the Acquired Assets in a timely manner, including a demonstration of financial wherewithal to close such sale; (y) provide a wire transfer or certified funds to Seller equal to the amount of Three Hundred Seventy Thousand And no/100 Dollars ($370,000) as an earnest money deposit; and (z) an executed asset purchase agreement in substantially the same form as this Agreement (with the possible exception with respect to the Assumed Obligations), without any contingencies and in form and substance acceptable to the Seller. Any Potential Bidder meeting all of the above requirements that wishes to participate in the Auction must acknowledge in writing that it is familiar with, understands and accepts the procedures specified herein. Any person qualifying under all of the above standards shall be entitled to bid to purchase the Assets will be hereinafter referred to as a "Qualified Bidder." Any bid made by a Qualified Bidder shall be referred to as a "Qualified Bid." Purchaser is deemed to be a Qualified Bidder.

(iii)    The Seller will offer the Acquired Assets for sale at the Auction in bulk. Prior to the conclusion of the Auction, the Seller will engage in an analysis (the "Bid Analysis") to determine which Qualified Bid is, in its best judgment, the highest or otherwise best offer(s) (the "Winning Bid"). A Person making a Winning Bid is hereinafter referred to as a "Winning Bidder"). At the Sale Hearing, the Seller shall ask the Bankruptcy Court to enter an order authorizing the Seller to consummate the Sale at the Winning Bid with the Winning Bidder and to execute such additional documentation as is reasonably necessary to close such Sale.

(iv)    The opening competing bid will be determined at the Auction, but shall not be less than Three Million Seven Hundred Thousand Dollars ($3,700,000.00) in cash value to the Seller's estate. Incremental bids thereafter will be established at the Auction.

(v)    The offers of the Winning Bid and Back-up Bid shall be irrevocable until the earlier of (i) the Closing of the Sale of the Acquired Assets, or (ii) the withdrawal of the Acquired Assets for sale by the Seller.

(vi)    In the event that a Winning Bidder defaults in the performance of its obligation to purchase the Assets pursuant to a Winning Bid, that Person's earnest money deposit shall be forfeited and shall be immediately transferred to the Seller. Notwithstanding the foregoing, such forfeiture shall not be in full satisfaction of any damages caused to any Person by the Winning Bidder's default as described herein. Any Person making an earnest money deposit who does not become the Purchaser shall have its earnest money deposit returned to it by the Seller within two (2) business days after the conclusion of the hearing at which the Winning Bid(s) are confirmed.

(vii)    In the event that a Winning Bidder defaults in the performance of its obligations to purchase the Acquired Assets pursuant to a Winning Bid, then the next highest bidder for the Acquired Assets shall be required to proceed as the Winning Bidder. Consequently, that Person's bid (the "Back-Up Bid") will be treated as the Winning Bid without further notice and hearing and entry of any additional order by the Court.

(viii)    Seller agrees that prior to the Auction, if any, Seller shall request an order from the Court that in the event Purchaser is not the Purchaser, and provided that Purchaser is not otherwise in default or has not terminated this Agreement for any other reason, Purchaser shall be paid a "break-up" fee in an amount equal to One Hundred Nine Thousand Dollars ($109,000.00) which amount will be paid by Seller to Purchaser from the Closing (or from any forfeited earnest money deposit) approved by the Bankruptcy Court of a Sale to a party other than the Purchaser.

14

(ix) Seller acknowledges and agrees that Purchaser has entered into this Agreement at arms-length and in good faith. The Seller further acknowledges and agrees that the Purchase Price agreed upon in this Agreement has not been controlled by any agreement and that the Purchaser's offer has not been collusive with any other bidder, in any way. Seller agrees to apply to the Bankruptcy Court for a finding that Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, accordingly, is entitled to all the benefits and protections thereof.

3.2   Executory Contract Period. Purchaser shall have sixty (60) days after the Closing Date, unless Purchaser earlier designates to Seller in writing that it does not want to have any additional Executory Contract assigned to it (the "Executory Contract Option Period") to designate an Executory Contract as an Assigned Contract. Seller hereby appoints Purchaser its agent-in-fact for the sole purpose of allowing Purchaser to continue to operate under the Executory Contracts until such time as Purchaser either designates such contract as an Assigned Contract, or designates that it does not want to have such contract assumed and assigned to it; provided, however, during such period, Purchaser shall be responsible for all obligations arising from or in connection with such Executory Contract(s).

3.3   Option to Reject Assigned Leases. Notwithstanding anything contained in this Agreement to the contrary, upon the election of Purchaser made prior to the Sale Hearing, the Seller shall reject, which rejection shall be effective as of the Closing Date, any one or more of the Assigned Leases. The Sale Motion shall specifically request that the Sale Order provide for such rejection upon Purchaser's election.

4.   Representations and Warranties of Seller. Subject to the terms, conditions and limitations set forth in this Agreement, Seller hereby represents and warrants to Purchaser as of the date hereof as follows:

4.1   Organization. Seller is a corporation validly existing under the laws of the State of Illinois, and has the corporate power and authority to own, lease and operate the Acquired Assets, and to carry on in all material respects the Business as now being conducted.

4.2   Corporate Authorization. The execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions are within Seller's corporate powers and have been duly authorized by all necessary action on the part of Seller. Subject to entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Case, this Agreement constitutes a valid and binding agreement of Seller that is enforceable in accordance with its terms.

4.3   Governmental Authorization. Except as disclosed in Schedule 4.3, the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby by Seller require no action by or in respect of, or filing with, any governmental body, agency or official other than (i) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (ii) any such action or filing as to which the failure to make or obtain would not have a Material Adverse Effect.

4.4    Noncontravention.  Subject to entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Case, the execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions do not and will not (i) violate Seller's articles or certificate of incorporation or bylaws, except to the extent any such violation would not have a Material Adverse Effect, (ii) assuming compliance with the matters referred to in Section 4.3, violate any applicable law, rule, regulation, judgment, injunction, order or decree, except to the extent any such violation would not have a Material Adverse Effect, (iii) except as to matters which would not reasonably be expected to have a Material Adverse Effect, constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation or to a loss of any benefit relating to any Acquired Asset to which Seller is entitled under any provision of any agreement or other instrument binding upon Seller except for breaches and defaults referred to in Section 365(b)(2) of the Bankruptcy Code, or (iv) result in the creation or imposition of any Lien on any Acquired Asset, except for Permitted Liens.

4.5.    Required Consents.  Except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and except as otherwise set forth on Schedule 4.5, there is no agreement or other instrument binding upon Seller requiring a consent or other action by any Person as a result of the execution, delivery and performance of this Agreement, except such consents or actions as would not, individually or in the aggregate, have a Material Adverse Effect if not received or taken by the Closing Date.

4.6.    Litigation.  Except as disclosed in Schedule 4.6, as of the date hereof, there is no action, suit, investigation or proceeding pending against, or to the best of Seller's knowledge, threatened against or affecting, the Acquired Assets before any court or arbitrator or any governmental body, agency or official which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions

4.7.    Compliance with Laws and Court Orders.  To the best of Seller's knowledge, information, and belief, Seller is not in violation of any law, rule, regulation, judgment, injunction, order or decree applicable to the Acquired Assets or the conduct of the Business, except for violations, which would not reasonably be expected to have a Material Adverse Effect

4.8.    Sufficiency of and Title to the Acquired Assets.

(a)    The Acquired Assets constitute all of the material property and assets owned, held or primarily used in the conduct of the Business (other than the Excluded Assets).

(b)    Upon consummation of the Transactions, Purchaser will have acquired good and marketable title in and to, or a valid leasehold interest in, each of the Acquired Assets, free and clear of all Liens and Claims to the maximum extent permitted by the Bankruptcy Code, other than Assumed Obligations and Permitted Liens.

16

     (c)    No Acquired Asset is subject to any Lien, except Liens which will attach to the proceeds of sale under this Agreement pursuant to Section 363 of the Bankruptcy Code or will not survive the Closing (the "Permitted Liens").

     4.9.   <u>Certain Fees</u>. Seller has not incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

     4.10.   <u>Intellectual Property</u>. Except for the consequences resulting from the commencement and continuation of the Bankruptcy Case, to the best of Seller's knowledge, information and belief: (a) there has been no material loss, cancellation, termination or expiration of any of the registrations or patents underlying the Intellectual Property Rights since the Petition Date; (b) the Business does not cause Seller to infringe or violate any of the patents, trademarks, service marks, trade names, mask works, copyrights, trade secrets, proprietary rights or other intellectual property of any other person, and Seller has not received any written or oral claim or notice of infringement or potential infringement of the intellectual property of any other person; and (c) there is no infringement of the Intellectual Property by any third party.

     4.11.   <u>Merchandise</u>.

     (a)    Since the Petition Date, Seller has not conducted any promotions or advertised sales at the Stores except promotions and sales in the ordinary course of business consistent with historic promotions and sales for comparable periods last year, other than (i) the "Spring Fever Sale"; and (ii) a twenty percent (20%) point of sale discount for all Merchandise.

     (b)    Since the Petition Date, Seller has not and shall not have up to the Closing Date, marked up or raised the price of any items of Merchandise, or removed or altered any tickets or any indicia of clearance merchandise, except in the ordinary course of business and;

     (c)    Since the Petition Date, Seller has maintained its pricing files in the ordinary course of business, and prices charged to the public for goods (whether in-store, by advertisement or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein (without consideration of any point of sale markdowns). All pricing files and records relative to the Merchandise have been made available to Purchaser.

     (d)    Seller has not transferred and shall not transfer to or from the Stores, any merchandise or goods outside the ordinary course in anticipation of the Closing or of the Inventory Taking.

     (e)    To the best of Seller's knowledge, information, and belief, all Merchandise is in material compliance with all applicable federal, state, or local product safety laws, rules, and standards. Seller shall provide Purchaser with its historic policies and practices, if any, regarding product recalls prior to the Closing Date.

4.12.  Real and Personal Property Leases.

(a)  Except as set forth Schedule 4.12(a) hereto, each of the Real Property Leases is legal, valid, binding, enforceable and in full force and effect, and subject to the entry of the Sale Order and Seller has neither delivered nor received any written notice from the nondebtor party to any such lease of the termination thereof (excluding in each case defaults to be cured by Bankruptcy Court order).  Subject to entry of the Sale Order and applicable orders of the Bankruptcy Court approving the assignment of the Assigned Leases, each of the Real Property Leases may be freely assigned (without third party consent) by Seller to Purchaser, or to any Purchaser designee.

(b)  Except as set forth on Schedule 4.12(b), to the best of Seller's knowledge, there are no pending or threatened condemnation proceedings against any of the locations subject to a Real Property Lease.

(c)  To the best of Seller's knowledge, information, and belief, there is no pending or proposed special assessment affecting or which may affect the Real Property Leases.

(d)  Seller has provided or otherwise made available to Purchaser prior to the date of this Agreement the following items to the extent same, or the information from which same can be prepared, are in the possession or control of Seller:

(i)  True, complete and accurate copies of all Real Property Leases, including all material amendments to and assignments of them; and

(ii)  True, complete and accurate copies of all environmental inspection reports with respect to the Real Property Lease locations and other material environmental documents relating to the Business in Seller's possession.  Without in any way modifying the obligations of Seller pursuant to this Agreement, Purchaser acknowledges that this Section 4.14(d) imposes no obligation on Seller to obtain new environmental inspection reports, surveys, title policies or commitments or site plans with respect to the Real Property Lease locations.

(e)  Except as disclosed in the environmental inspection reports provided or otherwise made available by Seller to Purchaser, to the best of Seller's knowledge, information and belief:

(i)  the Real Property Lease locations are and have been in material compliance with and have no contamination or other material liabilities arising under all federal, state, local and foreign statutes, regulations, orders and ordinances, and all common law concerning occupational health and safety, pollution or protection of the environment, as amended and in effect on or prior to the date the Sale Order is entered (hereinafter, the "Environmental Laws"), provided, however, that there may be mold or similar type of element at the Northbrook Store in the HVAC system;

18

(ii)    Seller is and has been in compliance with the Environmental Laws in the conduct of the Business and at the Stores and the Real Property Lease locations; and

(iii)    Seller has all material permits, licenses, and other authorizations that are required pursuant to Environmental Laws for the occupation and operation of the Real Property Lease locations.

4.13.    Benefit Plans. The Seller does not maintain, sponsor, contribute to, or have any obligation to contribute to, or have any liability or potential liability under or with respect to (i) any "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA, or (ii) any employee benefit plan, program or arrangement that provides for post-employment medical or health benefits (other than health continuation coverage required by COBRA).

5.    Representations and Warranties of Purchaser. Purchaser represents and warrants to Seller as follows:

5.1.    Organization. Purchaser is a limited liability company, as the case may be, duly and validly existing and in good standing under the laws of Delaware and has all company powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

5.2.    Company Authorization. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the transactions contemplated hereby are within the corporate powers of Purchaser and have been duly authorized by all necessary corporate action on the part of Purchaser. This Agreement constitutes a valid and binding agreement of Purchaser that is enforceable in accordance with its terms.

5.3.    Governmental Authorization. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions by Purchaser require no action by or in respect of, or filing with, any governmental body, agency or official other than (i) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, (ii) any such action or filing as to which the failure to make or obtain would not have a material adverse effect on the Purchaser or its ability to close the Transactions.

5.4.    Noncontravention. Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) conflict with or result in any breach of any provision of the organizational documents of Purchaser or any mortgage, trust indenture, lien, lease agreement, instrument, court order, judgment or decree, by which Purchaser is bound.

5.5.    Litigation. There is no action, suit, investigation or proceeding pending against or, to the knowledge of Purchaser, threatened against or affecting Purchaser before any court or arbitrator or any governmental body, agency or official which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

5.6.    Certain Fees. Purchaser has not employed or retained any broker, finder or incurred any obligation for brokerage fees, finder fees, or commissions with respect to the

transactions, brokerage fees, finders' fees commissions, or other similar fees in connection with this Agreement or the Transactions or otherwise dealt with anyone purporting to act in the capacity of a finder or broker with respect thereto whereby Purchaser or Seller may be obligated to pay such fee or a commission.

6.    Covenants of Seller.  Seller agrees that:

6.1.    Conduct of the Business.  Except as may be required by the Bankruptcy Court, except for the consequences resulting from the commencement and continuation of the Bankruptcy Case, and except as may be required or contemplated by this Agreement, from the date hereof until the earlier of the Closing Date or the date of termination of this Agreement, Seller shall use its commercially reasonable efforts to conduct the Business in the ordinary course strictly in accordance with the Budget and consistent with past practice and to preserve intact the business organizations and relationships with third parties (including suppliers and customers) and to keep available the services of the present employees of the Business including, specifically (i) selling inventory during such period at customary prices, (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public, except for Seller's historic and/or customary promotions, (iii) not returning inventory to vendors and not transferring inventory or supplies between or among Stores outside the ordinary course of business, (iv) not making any voluntary, material management personnel moves or changes at the Stores outside the ordinary course of business.  Without limiting the generality of the foregoing, from the date hereof until the earlier of the Closing Date or the date of termination of this Agreement, except (i) as disclosed on Schedule 6.1, (ii) as may be required by the Bankruptcy Court, (iii) in the ordinary course consistent with past practice, as may be required or contemplated by this Agreement, Seller will not (without the prior written consent of Purchaser):

(a)    with respect to the Business acquire a material amount of assets from any other Person;

(b)    sell, lease, license or otherwise dispose of any Acquired Assets except for Merchandise (1) pursuant to existing contracts or commitments, or (2) pursuant to Section 363 of the Bankruptcy Code;

(c)    agree or commit to do any of the foregoing; or

(d)    take any action that would reasonably be expected to cause the failure of any condition contained in Section 10 (other than actions taken by Seller in connection with the discharge of its fiduciary duties during the Bankruptcy Case).

(e)  Enter into any real estate contracts, renew leases, enter into leases, terminate leases, reject leases, amend leases, and consent to the assignment of leases.

6.2.    Access to Information.  From the date hereof until the earlier of the Closing Date or the date of termination of this Agreement, Seller shall reasonably afford, and shall cause its officers, employees, attorneys and other agents to reasonably afford, to Purchaser and its counsel, accountants and other representatives, access (at reasonable times during normal

20

business hours) to officers and other employees of the Business for the purposes of evaluating the Business and all properties, books, accounts, records and documents of, or relating to, the Business.

6.3.    Notices of Certain Events.  Seller shall promptly notify Purchaser of:

(a)    any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

(b)    any material written communication from any governmental or regulatory agency or authority in connection with or relating to the Transactions; and

(c)    the commencement of any actions, suits, investigations or proceedings relating to Seller or the Business that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.6 the commencement of any actions, suits, investigations or proceedings relating to Seller or the Business that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.6.

7.    Covenants of Purchaser.  Purchaser agrees that:

7.1.    Access.  On and after the Closing Date, Purchaser will afford promptly to Seller and its counsel, financial advisers and other agents reasonable access during normal business hours to its properties, Books and Records, employees, auditors and counsel to the extent necessary for financial reporting and accounting matters, employee benefits matters, the preparation and filing of any Tax returns, reports or forms, the defense of any Tax audit, claim or assessment, the reconciliation of Claims in the Bankruptcy Case, the preparation and confirmation of a plan in the Bankruptcy Case, other matters relating to the winding-up of the Seller's estate and/or the closing of the Bankruptcy Case, or to permit Seller to determine any matter relating to its rights and obligations hereunder or any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities; provided, however, Seller shall reimburse Purchaser for a mutually agreed upon reasonable per diem charge for such employee's time, to the extent necessary for the wind-up of Seller's bankruptcy proceedings or such other matter as are contemplated by this Section 7.1; provided, further, that any such access by Seller shall not unreasonably interfere with the conduct of the business of Purchaser.  Seller will hold, and will use its commercially reasonable efforts to cause its officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law, all confidential documents and information concerning Purchaser or the Business provided to them pursuant to this Section 7.1.

7.2.    Insurance.  To the extent that any insurance policies of Seller or any of its Affiliates cover any loss, liability, claim, damage or expense relating to the Business and such insurance policies continue after the Closing to permit claims to be made thereunder with respect to events occurring prior to the Closing, Seller shall cooperate with Purchaser in submitting and pursuing such claims.

7.3. Assumed Obligations. From and after the Closing Date, Purchaser shall (a) pay, perform and discharge, promptly when payment or performance is due or required, all of the Assumed Obligations, (b) take all actions necessary to satisfy its obligations under the terms and conditions of each of the Assigned Contracts, Assigned Leases, Purchaser Assigned Real Property Leases and Intellectual Property Rights, and (c) indemnify and hold harmless Seller from and against any damages arising out of a breach by Purchaser of this Section 7.3.

7.4. Books and Records. Solely to the extent that Purchaser takes physical possession of the Books and Records (or such lesser position thereof as Purchaser may desire), Purchaser shall preserve and maintain such Books and Records for a period of twelve (12) months after the Closing Date.

7.5 Employee Matters.

(a) Purchaser shall make offers of employment to substantially all employees associated with the operation of the Stores. In additional Purchaser may make offers of employment to other employees in the absolute discretion of the Purchaser. Seller shall assist Purchaser in effecting the change of employment of the Transferred Employees as of the Closing in an orderly fashion. Nothing herein expressed or implied shall confer upon any employee of Seller, any Transferred Employee, any other employee or any legal representative thereof any rights or remedies, including any right to employment or continued employment for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement. Purchaser is not assuming, and shall not be responsible for, any of Seller's obligations to its employees, and shall not be considered a successor employer and shall not have successor employer liability with respect to any employee benefits, collective bargaining agreement, the WARN Act, COBRA, and/or any severance or key employee retention bonus program as may be approved by the Bankruptcy Court.

(b) Purchaser agrees with respect to Transferred Employees that are hired by Purchaser: (i) to give such employees credit under Purchaser's benefit plans, programs, and arrangements, including credit for accrued vacation, for such employees' period of service with Seller, provided that such credit shall only be taken into account under any tax-qualified plan maintained by Purchaser, if any, for purposes of determining such employees' eligibility for participation and eligibility to satisfy any hours of service requirement in order to receive an allocation of an employer contribution; and (ii) to provide coverage to such employees who are eligible under Purchaser's health, medical, life insurance and other welfare plans.

8. Covenants of Purchaser and Seller. Purchaser and Seller agree that:

8.1. Efforts; Further Assurances. Subject to the terms and conditions of this Agreement, Purchaser and Seller will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things reasonably necessary under applicable laws and regulations to consummate the Transactions contemplated by this Agreement prior to the End Date; provided, however, Seller shall be entitled to take such actions as are required in connection with the discharge of its fiduciary duties during the Bankruptcy Case. Seller and Purchaser agree to execute and deliver such other documents,

22

certificates, agreements and other writings and to take such other actions as may be reasonably necessary in order to vest in Purchaser good title to the Acquired Assets or to evidence the assumption by Purchaser of the Assumed Obligations.

8.2.    Certain Filings. Seller and Purchaser shall cooperate in good faith with one another (i) in determining whether any action by or in respect of, or filing with, any governmental body, agency, official or authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assigned Contracts or Intellectual Property Rights, in connection with the consummation of the Transactions, and (ii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

8.3.    Bankruptcy Sale Order. The Seller shall have filed the Sale Motion as required by Section 3.1 and the Bankruptcy Court shall thereafter have entered the Sale Order, which must be reasonably satisfactory in form and substance to Purchaser and Seller. Seller and Purchaser shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of one or more orders, (collectively, the "Sale Order") of the Bankruptcy Court in the Bankruptcy Case (i) approving this Agreement (ii) authorizing the sale of the Acquired Assets pursuant to Section 363 of the Bankruptcy Code, (iii) authorizing the assumption and/or assignment of the Assigned Contracts, Assigned Leases and the Intellectual Property Rights (if applicable) pursuant to Section 365 of the Bankruptcy Code (iv) approving and authorizing the Transactions; and (v) authorizing Purchaser to object to and prosecute any 503(b)(9) Claim Amount, at Purchaser's expense; including, but not limited to the authority to raise, as a defense to such claims, the receipt by any claimant of any avoidable transfers. In connection with the assumption and/or assignment of the Assigned Contracts, Assigned Leases and any Intellectual Property Rights pursuant to Section 365 of the Bankruptcy Code, Purchaser shall take all actions required to provide "adequate assurance of future performance" by Purchaser under the Assigned Contracts, Assigned Leases and such Intellectual Property Rights after the Closing. Seller and Purchaser shall consult with one another regarding pleadings that either of them intends to file, or positions either of them intend to take, with the Bankruptcy Court in connection with or that might reasonably affect, the Bankruptcy Court's entry of the Sale Order. In addition, (i) the Sale Order must include the terms and conditions set forth in Section 3.1(a) above; (ii) the Sale Order must provide that no liens, claims, encumbrances and interests of any kind or nature whatsoever shall encumber the Acquired Assets but shall attach only to the proceeds of the Sale; (iii) the Sale Order shall not have been reversed, stayed, modified or amended and as to which (a) the time to appeal or seek review, reargument or rehearing has expired and as to which no appeal or petition for certiorari, review or rehearing is pending, or (b) if appeal, review, reargument, rehearing or certiorari of such order has been sought, such order has been affirmed and the request for further review, reargument, rehearing or certiorari has expired, as a result of which such order has become final and nonappealable in accordance with applicable law; (iv) the Sale Order must provide that this Agreement constitutes the best offer or value received for the Acquired Assets; (v) the Sale Order must provide that the Bankruptcy Court retains jurisdiction to enforce the provisions of this Agreement in all respects; (vi) the Sale Order must provide that the provisions of the Sale Order are nonseverable and mutually dependent; (vii) the Sale Order must provide that the transactions contemplated by this Agreement are undertaken by Purchaser in good faith, as that

term is used in section 363(m) of the Bankruptcy Code; (viii) the Sale Order must provide that the terms and provisions of the Sale Order and this Agreement shall remain in full force and effect upon the dismissal or conversion of the terms and provisions of the Order and this Agreement shall be binding on all creditors and other parties in interest in any subsequent Chapter 7 Case. The Sale Order shall provide that, notwithstanding Rules 6004(g) and Rule 6006(d) of the Federal Rules of Bankruptcy Procedure, the Sale Order shall take effect immediately upon signature and any stay of such Sale Order is lifted and waived. Notwithstanding the foregoing clause, Purchaser, in its sole discretion, may close the transactions contemplated herein prior to the Sale Order becoming final.

8.4.    Notices.  If at any time prior to the End Date (i) Purchaser becomes aware of any material breach by Seller of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Seller, or (ii) Seller becomes aware of any breach by Purchaser of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Purchaser, the Party becoming aware of such breach shall promptly notify the other Party, in accordance with Section 13.1, in writing of such breach. Upon such notice of breach, the breaching Party shall have 10 days to cure such breach prior to the exercise of any remedies in connection therewith.

9.    Tax Cooperation.  Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Acquired Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Seller and Purchaser shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Acquired Assets or the Business.

10.    Closing Conditions.

10.1.    Conditions to Obligations of Purchaser and Seller.  The obligations of Purchaser and Seller to consummate the Closing are subject to the satisfaction of the following conditions:

(a)    The Bankruptcy Court shall have entered the Sale Order in the Bankruptcy Case, in form and substance reasonably acceptable to Seller and Purchaser and that includes the provisions prescribed under Section 8.3 above; and

(b)    No injunction, stay or similar order or decree, issued by any court, tribunal or governmental entity, shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

10.2.    Conditions to Obligations of Purchaser.  The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

24

(a)     Seller shall have performed in all material respects all of its obligations hereunder required to be performed by Seller on or prior to the Closing Date;

(b)     the Cost Value of the Merchandise (other than any Defective Merchandise) on the Closing Date is not less than Two Million Eight Hundred Thousand Dollars ($2,800,000.00);

(c)     Purchaser shall have entered into an amendment to each Assigned Leases or a new leases for each respective Store and Warehouse Facility, upon terms and in form and content satisfactory to Purchaser in Purchaser's sole discretion; and

(d)     the representations and warranties of Seller contained in this Agreement shall be true and correct at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct as of such earlier date), with only such exceptions as would not in the aggregate reasonably be expected to have a Material Adverse Effect.

10.3.   <u>Conditions to Obligations of Seller</u>.  The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver by Seller) of the following further conditions:

(a)     Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it on or prior to the Closing Date;

(b)     the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date); and

(c)     Seller shall have received all documents it may reasonably request relating to the existence of Purchaser and the authority of Purchaser for this Agreement, all in form and substance reasonably satisfactory to Seller.

11.    <u>Survival; Indemnification</u>.

11.1.   <u>Survival.</u>  The (a) representations and warranties of Seller, and (b) covenants and agreements of Seller that by their terms are to be performed at or before Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith, shall survive the Closing.  The covenants and agreements of Seller contained herein that by their terms are to be performed after Closing shall survive the Closing for such terms.

11.2.   <u>Indemnification</u>.  Each of Purchaser and Seller agrees to indemnify the other with respect to any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees which are alleged to be due and payable with respect to the Transactions and which are asserted as a result of the actions of the indemnifying party.

12.    <u>Termination</u>.

12.1.    <u>Grounds for Termination</u> . This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of Seller and Purchaser;

(b)    by Seller or Purchaser, if the Closing shall not have been consummated on or before the later of July 15, 2009 (the "<u>End Date</u>"), unless the Party seeking termination is in breach of its obligations hereunder;

(c)    by Seller or Purchaser, if any condition set forth in <u>Section 10.1</u> is not satisfied, and such condition is incapable of being satisfied by the End Date;

(d)    by Purchaser, if any condition set forth in <u>Section 10.2</u> has not been satisfied, and such condition is incapable of being satisfied by the End Date; or

(e)    by Seller, if any condition set forth in <u>Section 10.3</u> has not been satisfied, and such condition is incapable of being satisfied by the End Date.

The Party desiring to terminate this Agreement pursuant to this <u>Section 12.1</u> (other than pursuant to <u>Section 12.1(a)</u>) shall give notice of such termination to the other Party in accordance with <u>Section 13.1</u>.

12.2.    <u>Effect of Termination</u>.  If this Agreement is terminated as permitted by <u>Section 12.1</u>, such termination shall be without liability of any Party (or any stockholder, director, officer, employee, counsel, financial adviser, agent, consultant or representative of such Party) to the other Party to this Agreement.

12.3.    <u>Expenses</u>.  All costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

12.4.    <u>Exclusive Remedies</u>.  (a) Purchaser and Seller acknowledge and agree that if this Agreement is terminated pursuant to <u>Section 12.1</u>, the provisions of <u>Section 12.2</u> set forth the sole and exclusive remedies of the Parties.

(b)    If between the date of execution and delivery of this Agreement and the Closing Date, any casualty or act of God prevents the conduct of business in the ordinary course of any Store or Warehouse Facility that constitutes either an Assigned Lease location or Real Property location resulting in a Material Adverse Effect, then Purchaser may elect either to (i) terminate this Agreement or (ii) receive an adjustment to the Purchase Price (other than to the Carve Out or the 503(b)(9) Claim Amount) in an amount to be mutually agreed upon by Purchaser and Seller.

26

13.    Miscellaneous.

13.1.    Notices.  All notices, requests and other communications to any Party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to Purchaser, to:

MS Mark Shale, LLC
5215 Old Orchard Road, Suite 630
Skokie IL 60077
Attention: Harold Sullivan
Fax:

with a copy to:

Steven B. Towbin
Shaw Gussis Fishman Glantz
   Wolfson & Towbin LLC
321 North Clark Street, Suite 800
Chicago, Illinois 60610
Fax: (312) 980-3888

To Borrower:

Al Baskin Co. d/b/a Mark Shale
900 N. Michigan Avenue
Chicago, Illinois
Attention: Scott Baskin
Fax: (312) 654-5065

with a copy to:

Chad H. Gettleman
Adelman & Gettleman, Ltd.
53 W. Jackson Blvd., Suite 1050
Chicago, IL  60604
Fax:    (312) 435-1059

or to such other address as the party may provide in writing.

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice, request or communication

shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

13.2.   Waivers.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

13.3.   Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided, however, that Purchaser may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of the Seller.

13.4.   Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of law that would provide for application of another law.

13.5.   Jurisdiction

(a)   The Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement, the Agency Agreement, the Transition Services Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.

13.6.   Waiver of Jury Trial.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

13.7.   Third Party Beneficiaries.  No provision of this Agreement is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

13.8.   Entire Agreement; Amendments; Counterparts.  This Agreement and the Transition Services Agreement (including the Schedules and Exhibits hereto and thereto) set forth the entire agreement among the Parties with respect to the subject matter hereof and may be amended only by a writing executed by Purchaser and Seller.  This Agreement may be executed in counterparts, each of which when taken together shall constitute an original.  This Agreement

28

shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.

13.9.  Captions, Headings, Interpretation.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

13.10.  Schedules.  All of the exhibits on schedules attached hereto are incorporated herein and made part of this Agreement by reference.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PURCHASER:

MS MARK SHALE, LLC

By: _____

Name: _____

Title: _____

SELLER:

AL BASKIN CO.

By: _____

Name: _____

Title: _____

**SCHEDULE 2.1(a) OF
ASSET PURCHASE AGREEMENT
EXECUTORY CONTRACTS**

| Non-Debtor Party | Type of Contract | Cure Amount |
|---|---|---|
| 401K Advisors USA<br>1000 Skokie Blvd., Suite 160<br>Wilmette, IL 60091<br>Attn: Daniel Hansen | 401K Advisor | $0.00 |
| ADT Security Services, Inc.<br>P.O. Box 371967<br>Pittsburgh, PA 15250-7967 | Alarm Service<br>HQ - Acct/Customer<br>#01300133238736;<br>Michgan Ave. - Acct/Customer<br>01300133245580;<br>Michgan Ave. - Acct/Customer<br>#01300 113132001;<br>Northbrook - Acct/Customer #01300<br>113134952;<br>Oakbrook - Acct/Customer #01300<br>113031831;<br>Oakbrook - Acct/Customer #01300<br>113031830; | $0.00 |
| American Express<br>2157 N. Seminary Ave., Unit 1<br>Attn: Heather Herbert<br>Chicago, IL 60614 | American Express Processing - HQ | $0.00 |
| Chubb Insurance Company<br>500 Park Blvd., Suite 600<br>Itasca, IL 60143 | HQ - Property Casualty, Liability<br>Insurance - Policy #35874925;<br>HQ - Workers Compensation<br>Insurance - Policy #71722090;<br>HQ - Automobile Insurance -<br>Policy #73548269;<br>HQ - Umbrella Insurance -<br>Policy #79849519;<br>HQ - Crime Insurance -<br>Policy #82088249;<br>HQ - Ocean Marine Insurance -<br>Policy #FO46046 | $0.00 |
| Delta Dental Of Illinois<br>P.O Box 805275<br>Chicago, IL 60680-5275 | Dental Insurance - Policy #10537 | $0.00 |

83612.2 6/30/09

| Non-Debtor Party | Type of Contract | Cure Amount |
|---|---|---|
| Fifth Third Processing Solutions MD10909A 38 Fountain Square Plaza Cincinnati, OH 45263 Attn: Brian Tilley | Visa/Mastercard Processing - HQ | $0.00 |
| Fujitec America Inc. 1930 Paysphere Circle Chicago, IL 60674 | Elevator Maintenance - MA Acct #23164 | $314.74 |
| Kone Inc. P.O. Box 429 Moline, IL 61266-0429 | Oak Brook - Elevator Maintenance - Acct # 40017797; Oak Brook - Elevator Maintenance - Acct #40037848 | $457.46 $42.07 |
| Merrill Lynch 10375 Park Meadow Drive, Suite 600 Attn: Kathy Rood Lone Tree, CO 80124 | 401K Provider - HQ Acct #200644 | $0.00 |
| Metlife Individual LT Care Insurance Dept CH 10165 Palatine, IL 60055-0165 | Long Term Care Insurance - HQ Policy #5116668 | $0.00 |
| PayChex Human Resources Services 1175 John Street West Henrietta, NY 14586 | Flex Spending Administration - HQ Acct # 0405-4091 | $0.00 |
| PayChex Major Market Services 1000 E. Warrenville Rd Naperville, IL 60563 | Payroll Processing - HQ Acct #4091 | $5,454.62 |
| PCM Technologies 2804 Centre Circle Dr. Downers Grove, IL 60515 | Music - MA Acct #0050938 Music - OB Acct #0050834 | $48.23 $48.23 |
| Prudential Group Life P.O. Box 101241 Atlanta, GA 30392-1241 | Long Term Disability & Life Insurance - HQ Policy #40452 | $0.00 |

| Non-Debtor Party | | Type of Contract | Cure Amount |
|---|---|---|---|
| Talx Corporation<br>3065 Paysphere Cir<br>Chicago, IL 60674-0030 | | Unemployment Administration -<br>HQ Acct # AG0500 | $884.41 |
| Telecheck Service<br>P.O. Box 17310<br>Denver, CO 80217-0310 | | Check Approval -<br>HQ Acct #19298591 | $1,181.11 |
| United Healthcare<br>22561 Network Place<br>Chicago, IL 60673-1225 | | Medical Insurance - HQ<br>Policy #700128 | $0.00 |
| | | | |

### SCHEDULE 2.1(b) OF
### ASSET PURCHASE AGREEMENT
### ASSIGNED LEASES

| | | |
|---|---|---|
| Urban Retail Properties, Co.<br>900 N. Michigan Ave., Ste. 850<br>Chicago, IL 60611 | Lease for 900 N. Michigan Avenue<br>Retail Store | $312,658.94 |

### SCHEDULE 2.1(e) OF
### ASSET PURCHASE AGREEMENT
### INTELLECTUAL PROPERTY

Miscellaneous intellectual property, including trademarks, trade names, service marks, brand names, symbols, logos, and related intellectual property, if any.

83612.2 6/30/09

**SCHEDULE 2.1(f) OF
ASSET PURCHASE AGREEMENT
FF&E and EQUIPMENT**

To be Compiled at Closing

**SCHEDULE 2.6(c) OF**
**ASSET PURCHASE AGREEMENT**
**PURCHASE PRICE**

To Be Agreed Upon at Closing

## EXHIBIT

### TO SALE ORDER

**EXECUTORY CONTRACTS TO BE ASSUMED AND**